125 F.3d 1272
 97 Cal. Daily Op. Serv. 7317, 97 Daily Journal
D.A.R. 11,810
FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as
Receiver of American Commerce National Bank,
Plaintiff-Appellee,
v.
Gerald J. GARNER; Joan Garner, Defendants-Appellants.
FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as
Receiver of American Commerce National Bank,
Plaintiff-Appellee,
v.
Daniel GARNER, Defendant-Appellant.
 Nos. 96-56710, 96-56754.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 6, 1997.
Decided Sept. 11, 1997.
 
 Carol L. Newman, Los Angeles, CA; Gerald J. Garner, in Pro Se, Newport Beach, CA; Charles W. Tourdot, Norwalk, CA; and Robert M. Silverman, Los Angeles, CA, for defendants-appellants.
 Jaclyn C. Tanner, FDIC, Washington, DC, Richard B. Noulles, Gable Gotwals Mock Schwabe Kihle Gaberino, Tulsa, OK, for plaintiff-appellee.
 Appeals from the United States District Court for the Central District of California; George H. King, District Judge, Presiding. D.C. No. CV-96-02668-GJK.
 Before: BROWNING, BRUNETTI, and TROTT, Circuit Judges.
 BRUNETTI, Circuit Judge:
 
 
 1
 This is a consolidated appeal from the district court's decision to grant a preliminary injunction requested by the Federal Deposit Insurance Corporation freezing Gerald and Joan Garner's assets and appointing a trustee over those assets. The court imposed the injunction during the pendency of a lawsuit filed by the FDIC against the Garners. In the underlying suit, the FDIC seeks to recover damages for torts and statutory violations in connection with the Garners' management of the American Commerce National Bank. The principal legal question we address is whether the FDIC may invoke a preliminary injunction asset freeze in their suit against the Garners under the Taxpayer Recovery Act absent allegations of fraudulent conduct.
 
 
 2
 We affirm the grant of the preliminary injunction.
 
 I. FACTS
 A. Joan and Gerald Garner's Appeal
 
 3
 On April 30, 1993, the Office of the Comptroller of the Currency ("OCC") closed the American Commerce National Bank ("Bank") pursuant to 12 U.S.C. § 1821(c)(5) because of unsafe and unsound banking practices, including insider abuses. On April 1, 1996, the Federal Deposit Insurance Corporation ("FDIC"), acting as receiver for the bank, brought suit against Gerald Garner, the former Chairman and Chief Executive Officer of the Bank and his wife, Joan, also a former Bank Director. Joan Garner had also borrowed significant amounts of money from the Bank. The FDIC charged the Garners with negligence, gross negligence, breach of fiduciary duty, and lending limit violations, and sought over ten million dollars in damages. In the same complaint, the FDIC sued Gerald Garner's brother, Daniel Garner, also a former Bank Officer.
 
 
 4
 In the complaint, the FDIC listed numerous "illustrative transactions" of the "types of failures, breaches and violations of duty committed by the [defendants] which damaged the bank." The FDIC alleged that the Bank made numerous imprudent loans to Joan Garner "simply because she was a bank director and was married to Bank Chairman, Gerald Garner." At the time of the Bank's closing, Joan Garner owed the bank over one million dollars. The FDIC claimed that the Bank made three imprudent loans to Gerald Garner's brother, Harvey, resulting in losses of approximately $185,000. The complaint also alleged that the Bank imprudently honored over 5,000 overdraft checks drawn on an account held by Coast Plaza Doctors Hospital ("CPDH"), a business owned and controlled by Gerald Garner. On the date that the OCC closed the Bank, CPDH owed over $1.2 million for these overdrafts. In total, the complaint detailed eleven imprudent transactions resulting in damages to the Bank in excess of ten million dollars.
 
 
 5
 On July 22, 1996, the FDIC applied to the district court for an ex parte temporary restraining order ("TRO") freezing the Garners' assets and appointing a temporary trustee while it prosecuted the underlying suit; it also applied for an order to show cause why a preliminary injunction should not issue. The motion relied on 12 U.S.C. §§ 1821(d)(18) and (19), which constitute the asset freeze provisions of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act ("TRA"). In seeking the proposed preliminary injunction, the FDIC argued that the Garners had transferred assets to their family members, trusts, and other entities controlled by them and "appear to have engaged in efforts to transfer, dissipate or otherwise place their assets beyond the reach of their creditors."
 
 
 6
 The FDIC submitted two declarations in support of the application for the TRO and preliminary injunction. First, the declaration of Todd Menenberg, an experienced certified public accountant, listed over eighty loans which the Bank imprudently and negligently approved. The FDIC attached over eighty pages of narrative summaries, summaries of deficiencies, and details about the Garners' involvement in granting these loans. The FDIC culled this information from Bank records and depositions. Overall, the declaration addressed loans to nine different entities in painstaking detail. The exhibits listed the amounts and dates of loans, the loan numbers, whether the loans were secured by collateral, and other relevant information. According to Menenberg, the exhibits revealed a consistent practice of improper banking procedures through "imprudently and negligently" approved loans.
 
 
 7
 The FDIC also submitted the declaration of Pamela Playdon, a senior attorney for the Corporation. Playdon's thirty-nine-page declaration set forth a myriad of improper banking and financial activities by the Garners and echoed many of the charges maintained in the Menenberg declaration. Listed improprieties included: payment of excessive salaries to both Gerald and Joan Garner, payment by the Bank of over $100,000 of the Garners' personal expenses, improper loans to family members, friends, and related business entities, and numerous other questionable financial dealings. In addition, Playdon's declaration set forth the basis for the FDIC's fear of a dissipation of assets by the Garners. This included numerous instances where the Garners failed to comply with subpoenas requesting information on their assets and over fifty examples of asset transfers among the Garners and their family members, trusts, and related business entities. The FDIC supported the Playdon declaration with 186 exhibits which included the Garners' tax statements, sales receipts, checking account statements, and other financial documents.
 
 
 8
 On July 26, 1996, the district court entered a minute order under seal declining to rule on the request for a TRO and requesting further briefing from the FDIC on the issues of the standard and scope of the injunctive relief, the constitutionality of the temporary restraining order and whether the defendants' rights were adequately protected under the temporary restraining order. The court noted that the:
 
 
 9
 FDIC has made a sufficient showing of its likelihood of success on the merits of its breach of fiduciary duty and negligence claims in the underlying lawsuit. However, it is far from clear that the FDIC has properly applied the standard for a TRO motion brought pursuant to 12 U.S.C. § 1821(d)(18) and (19) to the case at bar.
 
 
 10
 On August 15, after the FDIC had submitted further briefing addressing the legal basis for injunctive relief, the district court issued an order denying the FDIC's application without prejudice to its reassertion. The court concluded that subsections 1821(d)(18) and (19) did not authorize the court to issue an asset freeze order unless the FDIC either brought a fraudulent conveyance claim under subsection 1821(d)(17), asserted an alternative fraud claim, or sought to collect a prior judgment based on fraudulent activities. The court also held that, alternatively, the FDIC had failed to demonstrate adequately that it was entitled to injunctive relief under the standards set forth in FSLIC v. Sahni, 868 F.2d 1096, 1097 (9th Cir.1989).
 
 
 11
 On August 27, the FDIC reapplied for a temporary restraining order and submitted additional briefing on the scope of available injunctive relief. On October 29, the court granted the FDIC's Second Amended Proposed Temporary Restraining Order and set the FDIC's Application for a Preliminary Injunction and Appointment of a Trustee for a show cause hearing.
 
 
 12
 At the show cause hearing, the court explained that although it had concluded previously that subsections 1821(d)(17), (18), and (19) were to be applied as a package, it was
 
 
 13
 now satisfied that a basis for the type of relief sought, putting aside the scope of the relief, exists within the title--the act that is within 12 U.S.C. section 1821(d)(18) and (19), so those sections can provide the type of relief sought by the FDIC separate and apart from any allegation of fraud or fraudulent activity or fraudulent conveyances which may otherwise give rise to claims or actions under 1821(d)(17).
 
 
 14
 The court also found that the FDIC had made a sufficient showing both of the likelihood of success on the merits of the underlying suit and of the possibility of dissipation of assets by the Garners. Consequently, the court granted the preliminary injunction freezing the Garners' assets.
 
 
 15
 To ensure that the asset freeze was as narrow as possible, the court ordered the parties to negotiate the terms of the order and to set forth their respective positions on any provisions that could not be agreed upon. On November 25, the parties submitted their proposed order, including annotations and objections from the Appellants. On December 3, the court entered the Preliminary Injunction and Order Appointing a Trustee and ordered the Garners to turn over certain property to the trustee by December 10. The Garners filed a notice of appeal of the asset freeze order with the Ninth Circuit on December 5. The district court denied their application for an emergency stay of the order on December 6.
 
 
 16
 On December 20, the Garners filed a petition under Chapter 11 of the United States Bankruptcy Code. On January 23, 1997, the district court issued an order appointing a trustee in the bankruptcy proceeding, subjecting action under the preliminary injunction asset freeze order to the automatic stay provisions of 11 U.S.C. § 362(a), and barring the FDIC from taking any action to enforce the asset freeze order. The district court, however, modified the Chapter 11 automatic stay to permit the Garners to prosecute this appeal and to allow the FDIC to proceed with its underlying district court action against the Garners and others. This appeal timely followed.
 
 B. Daniel Garner's Appeal
 
 17
 Daniel Garner appeals the inclusion of two trusts, G Family Trust Number Two and G Family Trust Number Twelve, in the preliminary injunction asset freeze. He contends that there was "no evidence before the court [that] either Gerald Garner or Joan Garner has any interest in the corpus of either of the aforestated trusts." Therefore, Daniel Garner contends, the trusts "should not have been usurped into the province of this preliminary injunction as no facts were presented, which would have warranted such a finding."
 
 II. Standard of Review
 
 18
 A district court's order regarding preliminary injunctive relief is subject to limited review. The grant of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of facts. Does 1-5 v. Chandler, 83 F.3d 1150, 1152 (9th Cir.1996). Although district courts have wide discretion in issuing preliminary injunctions, "where the district court is alleged to have relied on erroneous legal premises, review is plenary." Id. 83 F.3d at 1152 (quoting Miller v. Cal. Pac. Med. Ctr., 19 F.3d 449, 455 (9th Cir.1994) (en banc)).
 
 III. Analysis
 
 19
 A. Standards for Issuance of Preliminary Injunction
 
 
 20
 Federal Rule of Civil Procedure 65 provides the general procedure for obtaining a preliminary injunction. This court has articulated legal standards governing the issuance of a preliminary injunction:
 
 
 21
 To obtain a preliminary injunction a party must demonstrate either 1) a combination of probable success on the merits and the possibility of irreparable injury, or 2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor.
 
 
 22
 Metro Pub. Ltd. v. San Jose Mercury News, 987 F.2d 637, 639 (9th Cir.1993); see also 13 Moore's Federal Practice, § 65.22[i] (Matthew Bender 3d ed.1997). In granting the preliminary injunction, the district court focused its analysis on the probability of success/irreparable injury test.
 
 
 23
 B. Subsections 1821(d)(18) and (19) Authorize Preliminary Relief Without Allegations of Fraudulent Conduct
 
 
 24
 The district court twice rejected the FDIC's attempts to enforce a TRO and preliminary injunction under the standards for injunctive relief promulgated in 12 U.S.C. §§ 1821(d)(18) and (19). Although the court noted that the "FDIC has shown that it was likely to succeed on the merits" of the case, it questioned the FDIC's use of subsections (18) and (19) as authorization for issuing the preliminary injunction.
 
 
 25
 The district court eventually concluded that the preliminary injunction provisions of the Taxpayer Recovery Act applied to authorize the FDIC's motion for an asset freeze. We agree with the court's interpretation of the statute. 12 U.S.C. § 1821(d)(18) provides that, at the request of the FDIC, any court of competent jurisdiction may:
 
 
 26
 issue an order in accordance with Rule 65 of the Federal Rules of Civil Procedure, including an order placing the assets of any person designated by the Corporation ... under the control of the court and appointing a trustee to hold such assets.
 
 
 27
 Subsection 1821(d)(19) modifies Rule 65's requirements for injunctive relief when the FDIC is the applicant:
 
 
 28
 Rule 65 ... shall apply with respect to any proceeding under paragraph (18) without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate.
 
 
 29
 The Appellants contend that the district court erred in issuing the preliminary injunction freezing their assets because "[s]ections 18 and 19 were not intended to give the FDIC the authority to initiate a total pre-judgment freeze on a defendant's assets absent either (1) fraudulent transfers or (2) a nexus between assets allegedly wrongfully obtained and the assets which the FDIC seeks to freeze."
 
 
 30
 Appellants argue that Congress enacted subsections (18) and (19) in conjunction with subsection (17) and intended for them to be used as a package. 12 U.S.C. § 1821(d)(17), entitled "Fraudulent transfers," allows the FDIC to
 
 
 31
 avoid a transfer of any interest of an institution-affiliated party ... if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution.
 
 
 32
 The Appellants contend that the FDIC's invocation of subsections (18) and (19) without the use of section (17) or other allegations of fraud is impermissible. They argue that neither case law, statutory interpretation of the TRA, nor the legislative history of the statute supports the use of subsections (18) and (19) absent some showing of fraud. We reject this contention.
 
 1. Interpretation of Section 1821(d)
 
 33
 In granting the injunction, the district court concluded that:
 
 
 34
 a basis for the type of relief sought ... exists within the title ... so [subsections 1821(d)(18) and (19) ] can provide the type of relief sought by the FDIC separate and apart from any allegation of fraud or fraudulent activity or fraudulent conveyances which otherwise may give rise to claims or actions under 1821(d)(17).
 
 
 35
 Although the Ninth Circuit has not addressed the present question, other circuits have examined similar issues involving the use of 1821(d) both with and without allegations of fraud.
 
 
 36
 Here, the district court's decision expressly rejected the analysis in the Appellants' primary case, FDIC v. Floyd, 827 F.Supp. 409 (N.D.Tex.1993). In Floyd, the court required a showing of fraudulent conduct before the FDIC could use 1821(d)(18) and (19) to freeze an individual's assets to collect on a promissory note. Floyd, 827 F.Supp. at 412. In support of this decision, the court pointed to the "grouping of subsections (18) and (19) with subsection (17), which allows the FDIC to avoid fraudulent transfers. The common-sense approach is to read the three subsections as a package." Id. at 413; see also FDIC v. Faulkner, 991 F.2d 262, 264-65, 268 (5th Cir.1993) (affirming asset freeze when fraud was alleged under 1821(d)(17)); RTC v. Cruce, 972 F.2d 1195, 1199-1200 (10th Cir.1992) (affirming asset freeze when fraud was evidenced); FDIC v. Cafritz, 762 F.Supp. 1503, 1508 (D.D.C.1991) (affirming asset freeze upon proof of previous fraudulent activity concerning a portion of the assets to be frozen). The court concluded that when an "underlying lawsuit does not allege fraudulent activity ... a petition for preliminary injunction must show some potential injury evidenced by a clear nexus between past fraudulent conduct and the property for which restraint is sought under the facts of the underlying suit." Floyd, 827 F.Supp. at 414.
 
 
 37
 We reject Floyd's reasoning and hold that the FDIC can use subsections (18) and (19) in the absence of either subsection (17) or other allegations of fraud. We look to the plain language of the statute for guidance and, if necessary, augment our analysis with the legislative history. See Alarcon v. Keller Indus., Inc., 27 F.3d 386, 389 (9th Cir.1994) ("[W]e look first to the plain language of the statute, construing the provisions of the entire law, including its objects and policy to ascertain the intent of Congress. Then, if the language is unclear we look to its legislative history.") (citations omitted).
 
 
 38
 Subsection (17) explicitly authorizes the avoidance of fraudulent transfers involving banking institutions. It is obvious that the thrust of this provision is to recover transactions which defraud "the insured depository institution ... or any other appropriate Federal banking agency." 12 U.S.C. § 1821(d)(17). On the other hand, subsection (18) is a more general provision. It allows the FDIC to obtain injunctive relief on the assets of "any person designated by the corporation." 12 U.S.C. § 1821(d)(18). Nothing in the statutory language limits the application of subsection (18) to persons involved in fraudulent activity. Consequently, we find the plain language of the statute persuasive.
 
 
 39
 In addition, we note that numerous subsections of 1821(d) are cross-referenced; in fact, subsections (18) and (19) refer to each other. However, subsection (17) is not cross-referenced to either (18) or (19) and as we noted, the text of subsection (18) does not limit its use to fraudulent transfers. Thus, we decline to hold that the proximity of the subsections and their related subject matter mandates that they be used in conjunction.
 
 
 40
 We do not dispute that subsections (17)-(19) are often used as a package; injunctive relief is clearly an effective weapon for avoiding the type of fraudulent transfers contemplated by subsection (17). As this case demonstrates, however, the FDIC must be able to employ injunctive relief to preserve assets in other banking-related situations as well. We might be persuaded by the Appellants' arguments if the FDIC sought an injunction for assets wholly unconnected to banking activity. But where the defendants, like the Garners in the underlying suit, are officers and directors of the failed bank, and the FDIC alleges that they damaged the bank through illegal activities involving bank assets, then the FDIC may use the TRA to freeze assets absent allegations of fraud.
 
 
 41
 Here, the FDIC is acting as receiver for the failed financial institution under the TRA. As part of that receivership, it has sued the Garners for the alleged insider dealing which the FDIC claims inured to the benefit of the Garners. The FDIC is seeking damages against the Garners for the harm they caused the Bank with their illegal dealing; it seeks the injunction under the powers granted to it by subsections (18) and (19) to secure the Garners' assets from dissipation in contemplation of satisfaction of a judgement against the Garners. If the FDIC were to prevail in the underlying suit, it would look to the assets subject to the preliminary injunction to satisfy any money judgment rendered against the Garners.[1]
 
 
 42
 Congress enacted subsections 1821(d)(18) and (19) to "enhance the ability of the Justice Department and Federal bank regulatory agencies to prevent dissipation of property and assets." 136 Cong. Rec. E3686 (daily ed. November 2, 1990) (remarks of Rep. Schumer). In this case, FDIC attempts to do no more than what was intended by the legislature. We do not believe that Congress intended to limit the FDIC in its use of injunctive relief to counter banking violations. In terms of the costs imposed upon the government and taxpayers by such illegal actions, little difference exists between cases involving fraud and those which incur damages due to banking violations. Handcuffing the FDIC where it chooses to prosecute negligent or imprudent banking practices but does not charge fraud would contradict the manifest aim of the Taxpayer Recovery Act. Thus, we hold that the FDIC can apply the Act's injunctive relief provisions in the absence of allegations of fraud.
 
 
 43
 C. Do the Facts Meet the Standard for Issuance of a Preliminary Injunction?
 
 
 44
 Having determined that the FDIC used section 1821(d) properly, we turn to a limited analysis of the district court's decision to grant the preliminary injunction.
 
 1. Likelihood of Success on the Merits
 
 45
 The district court concluded that the FDIC demonstrated a likelihood of success on the merits in the breach of fiduciary duty and negligence claims.
 
 
 46
 The FDIC submitted two declarations (Menenberg and Playdon), supported by nearly 200 exhibits detailing allegations of negligence, gross negligence, and breach of fiduciary duty. The FDIC argues that the exhibits demonstrate that "the Garners repeatedly abused their insider positions at the Bank by grossly overcompensating themselves, by approving imprudent loans ... and by their use of bank funds to fund their own personal expenditures." A review of the exhibits firmly supports the court's finding of a likelihood of success on the merits of the FDIC's claims.
 
 
 47
 Although the Appellants dispute the district court's findings, they fail to present any concrete arguments casting doubt on the court's conclusions. Absent such a showing by appellant, we must accept the district court's decision on this issue; it was not clearly erroneous. See Does 1-5, 83 F.3d at 1152.
 
 2. Possibility of Irreparable Injury
 
 48
 Under 1821(d)(19), a preliminary injunction may be issued "without regard to the requirement of such rule that the applicant show that the injury, loss, or damage is irreparable and immediate." See 12 U.S.C. § 1821(d)(19); see also Cruce, 972 F.2d at 1200 ("Congress clearly intended to reduce the RTC's burden--vis a vis other litigants in similar situations--when it seeks to freeze assets").
 
 
 49
 Other courts have held that this provision does not eliminate the requirement for demonstrating some form of injury. See id. ("We emphasize that our holding does not eliminate the RTC's burden to show potential injury when it seeks a preliminary injunction."); see also 136 Cong. Rec. E3686 (daily ed. November 2, 1990) (remarks of Rep. Schumer) ("Congress still intends that the Corporation be required to make some showing of injury prior to obtaining relief"). Other courts have formulated a standard for the required showing: "Though the injury complained of need not be irreparable, it must be imminent, not remote or speculative. Plaintiff must show that it is likely to suffer ... harm if equitable relief is denied." Nat'l Credit Union Admin. Bd v. Concord Limousine, Inc., 872 F.Supp. 1174, 1177 (E.D.N.Y.1995) (internal quotations omitted) (citations omitted). We agree with this cogent standard and hold that a possibility of harm must be evident before a court may grant injunctive relief under subsection (19).
 
 
 50
 Here, the district court found that "there is at least a possibility that assets of Defendants Gerald Garner and Joan Garner will be dissipated during the pendency of this action unless injunctive relief is ordered by this Court." As with the analysis for likelihood of success on the merits, we must give substantial deference to the district court's factual findings. See Does 1-5, 83 F.3d at 1152. The Playdon declaration exhaustively detailed the FDIC's allegations concerning dissipation of assets. The district court soundly relied upon the declaration in assessing the possibility of dissipation of assets.
 
 
 51
 Although the Garners contest this finding, they again fail to provide any evidence to counter the FDIC's extensive documentation. They rely mainly on declarations submitted by their children. These arguments are insufficient to defeat the FDIC's proof of the possibility of dissipation of assets.
 
 
 52
 Based on the extensive allegations and documentation submitted, we affirm the court's ruling that the FDIC satisfied subsection 1821(d)(19)'s dissipation of assets standard.
 
 
 53
 D. The Injunction is Neither Unconstitutional nor Overbroad
 
 
 54
 The Appellants also contend that the preliminary injunction is unnecessarily punitive and overbroad and that its provisions violate their due process rights. The Garners direct this claim toward the preliminary injunction which they participated in drafting. The district court allowed Appellants the opportunity to review and comment upon the proposed order before issuing the injunction. Appellants cite no cases to support their due process claims and do not discuss how their participation affected this issue. Accordingly, the issue is waived. Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1502 (9th Cir.1996) (holding that party waives issue when it "present[s] no explanation in support of its contention of error.")
 
 
 55
 The Appellants also claim that the preliminary injunction is punitive and overbroad. This argument is directed essentially at the district court's approval of the settlement. As such, it is a factual review subject to the clearly erroneous standard. Does 1-5, 83 F.3d at 1152.
 
 
 56
 The Appellants also present no evidence that the court failed to perform a detailed review. To the contrary, the show cause hearing revealed that the district court carefully considered the proposed injunction and encouraged the parties to do the same. For example, the court stated, "I actually have gone through paragraph by paragraph and taken notes ... although I can tell you I have my own thoughts about certain paragraphs, whether they ought to be in or out or modified or whatever...." The district court's reasoned decision that the injunction was neither punitive nor overbroad was not clearly erroneous.
 
 
 57
 The Appellants also argue that the district court improperly applied section 1821(d) retroactively. Because the Appellants failed to raise this argument in their opening brief, we deem it waived. Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721, 726 (9th Cir.1992).
 
 
 58
 E. Gerald Garner Held and Used G Family Trusts Numbers Two and Twelve and they were Properly Included in the Preliminary Injunction
 
 
 59
 Daniel Garner contends that the district court improperly included G Family Trusts Numbers Two and Twelve. He claims that Gerald Garner had neither a personal interest nor did he commingle his assets with the two trusts. The Garners specifically deny any improper contact with the trusts and the FDIC has made assertions to the contrary. We again review the court's factual findings under a clearly erroneous standard. See Does 1-5, 83 F.3d at 1152.
 
 
 60
 A court is authorized to impose a preliminary injunction on assets which were controlled by a party, even if that party did not expressly own or possess those assets. See United States v. O'Brien, 836 F.Supp. 438, 441-42 (S.D.Ohio 1993) (holding that defendant's control or beneficial ownership of assets is sufficient to make them subject to restraint and forfeiture pursuant to statute authorizing preliminary injunction); see also Faulkner, 991 F.2d at 267 (allowing preliminary injunction freezing assets where non-party "actively participated ... in transferring assets fraudulently").
 
 
 61
 The FDIC made three principal factual assertions concerning Gerald Garner's involvement in the contested trusts. First, the FDIC alleges that "Gerald Garner paid substantial taxes for the trusts from his personal funds," an action which Daniel Garner fails to deny or explain. The FDIC also alleges that Gerald Garner caused substantial funds to be transferred between Trust Number Two and Coast Plaza Doctors Hospital; Gerald Garner chaired the hospital's board, his children nominally owned the general partner, and Daniel Garner possessed no interest in the business. Finally, and most significantly, the FDIC claims that "Gerald Garner caused substantial assets from the G Family Trust # 2 to be used for his personal benefit." The exhibits attached to Pamela Playdon's declaration provide substantial support for these assertions. Our review of the documents indicates that the district court did not err in relying on these factual conclusions.
 
 
 62
 Daniel Garner's unsupported assertions that G Family Trusts Numbers Two and Twelve were not connected with Gerald Garner do not counter the FDIC's extensive evidence to the contrary. The district court's findings were not clearly erroneous. Accordingly, we affirm the district court's inclusion of the trusts in the preliminary injunction.
 
 
 63
 AFFIRMED.
 
 
 
 [1]
 Because we find the statute's text is clear, we need not rely on legislative history. We do note that Floyd examined the legislative history and held that the "clear intent of Congress in these subsections is to address fraudulent activity." Floyd, 827 F.Supp. at 413; see also Cruce, 972 F.2d at 1199 ("The text of § 1821(d)(17)-(19) evidences Congress' clear intent to augment the RTC's ability to avoid fraudulent conveyances or to freeze assets that may have been fraudulently conveyed by parties related to insured depository institutions.")
 Our analysis of the legislative history does not lead us to such a firm conclusion. The Appellants cite commentary which broadly discusses Congress' goal of preventing fraudulent transfers through enactment of the TRA. See 136 Cong. Rec. E3684-86 (daily ed. November 2, 1990) (statement of Rep. Schumer). However, the record provides nothing to indicate that Congress contemplated barring the use of these provisions in the absence of fraud; only that fraud is the primary target of the law. Thus, we do not find the legislative history controlling on this issue.