UNIVERSITY OF HAWAII PROFES-SIONAL ASSEMBLY; Alexander Malahoff; Linda Currivan; Diane Ferreira; Hugh Folk; Vincent Linares; and David Miller, Plaintiffs–Appellees,

v.

Benjamin J. CAYETANO, in his capacity as Governor of the State of Hawaii, and Sam Callejo, in his capacity as Comptroller of the State of Hawaii, Defendants–Appellants.

No. 98–16148.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 15, 1999.

Filed July 14, 1999.

Gary Hynds, Deputy Attorney General, Honolulu, Hawaii, for the defendants-appellants.

T. Anthony Gill, Gill & Zukeran, Honolulu, Hawaii, for the plaintiffs-appellees.

Before: WIGGINS, TASHIMA, and SILVERMAN, Circuit Judges.

SILVERMAN, Circuit Judge:

This case involves a challenge by employees of the State of Hawaii to Act 355, the State's "pay lag" law. Act 355 would allow the State to postpone by a few days, at six different times, the dates on which state employees are to be paid. It also declares those postponements to be "not subject to negotiation." The district court granted a preliminary injunction against the operation of this statute on the ground that it impaired the obligations of the employees' collective bargaining agreement in

violation of the Contract Clause of the United States Constitution. We agree with the district court's reasoning and affirm.

## BACKGROUND

The predecessor to Act 355 was Act 80 (Session Laws of Hawaii 1996). Enacted in 1996, Act 80 gave Hawaii's governor the power to convert from a "predicted payroll" to an "after-the-fact payroll." A predicted payroll requires state agencies to assume or predict their employees' rate of absenteeism during an entire pay cycle. An after-the-fact payroll system pays employees only for time already worked, eliminating the overpayment problem. The problem with a predicted payroll is that if employees failed to report to work and had insufficient leave to draw against, overpayment results. The changeover from a predicted to an after-the-fact payroll system was to have been accomplished, according to the statute, by implementing "a one-time once a month payroll payment ... to effect [the] conversion...."

Before Act 80's enactment, Hawaii Revised Statutes ("HRS") § 78–13 provided that state employees were to be paid "at least semi-monthly." It is undisputed that for over twenty-five years it had been the custom and practice of the State to pay its employees on the fifteenth day and the last day of each month.

In response to Act 80, two unions, the Hawaii State Teachers Association ("HSTA") and the University of Hawaii Professional Assembly ("UHPA") filed a prohibited practice complaint with the Hawaii Labor Relations Board. The Unions complained that unilateral implementation of Act 80's pay lag program without first bargaining in good faith constituted a prohibited labor practice under state law. *See* HRS §§ 89–13(a)(5), (6), (7), (8), and 89–9.[1]

---

1. HRS §§ 89–13(a) provides in pertinent part:

 It shall be a prohibited practice for a public employer or its designated representative wilfully to:

 ...

 (5) Refuse to bargain collectively in good faith with the exclusive representative as required in section 89–9;
 (6) Refuse to participate in good faith in mediation, fact-finding, and arbitration procedures set forth in section 89–11;

The Hawaii Labor Board issued Order 1402 on January 17, 1997 finding that the long-standing fifteenth and last-day-of-the-month pay dates were material to the existing collective bargaining agreement. Order 1402 directed the State to cease and desist from implementing any pay lag without first negotiating with the unions. The State appealed Order 1402 to the state court, which reversed the order of the Labor Board. The state court reasoned that Order 1402 was not supported by the evidence and remanded the matter to the Labor Board for further proceedings. In any event, the State never implemented Act 80.

Meanwhile, the previous collective bargaining agreement between UHPA and the State expired. Negotiations over a new collective bargaining agreement were not proceeding well and by the end of 1996, the faculty members voted to strike if an agreement were not reached. UHPA wanted to bargain over the issue of any change in pay dates, but the State declined. Nevertheless, UHPA and the State entered into a new collective bargaining agreement on January 27, 1997. It was retroactive to July 1, 1995 and effective until June 30, 1999. Although the new collective bargaining agreement contained no provision regarding specific pay dates, it is undisputed that at that time, state employees were still being paid on the fifteenth and last days of the month.

Despite the fate of Act 80, on July 3, 1997, the Hawaii legislature enacted Act 355 (Session Laws of Hawaii 1997).[2] Act 355 does two main things. First, it authorizes a total of six pay lags, of between one and three days duration, aimed at implementing a conversion from a predicted to an after-the-fact payroll system. Second, it specifically excludes the subject of the pay lag from collective bargaining. It states: "The implementation of the after-the-fact payroll shall not be subject to negotiation under chapter 89."

Defendants touted that the pay lags would create a savings of approximately $51 million for the State by rolling over salaries to the next fiscal year and by reducing inadvertent salary overpayments.

Plaintiffs are individually named University of Hawaii faculty members and their union, the University of Hawaii Professional Assembly. On February 23, 1998, Plaintiffs filed the underlying complaint against Defendants for declaratory and

---

(7) Refuse or fail to comply with any provision of this chapter;
(8) Violate the terms of a collective bargaining agreement.
HRS § 89–9(a) provides, in pertinent part:
The employer and the exclusive representative ... shall negotiate in good faith with respect to wages....

2. Act 355 amended HRS § 78–13 to provide:
Unless otherwise provided by law, all officers and employees shall be paid at least semi-monthly except that substitute teachers, part-time hourly rated teachers of adult and evening classes, and other part-time, intermittent, or casual employees may be paid once a month and that the governor, upon reasonable notice and upon determination that the payroll payment basis should be converted from predicted payroll to after-the-fact payroll, may allow a one-time once a month payroll payment to all public officers and employees to effect a conversion to after-the-fact payroll as follows:

(1) the implementation of the after-the-fact payroll will commence with the June 30, 1998, pay day, which will be delayed to July 1, 1998;
(2) The July 15, 1998, pay day will be delayed to July 17, 1998;
(3) The July 31, 1998 pay day will be delayed to August 3, 1998;
(4) The August 14, 1998 pay day will be delayed to August 19, 1998;
(5) The August 31, 1998 pay day will be delayed to September 4, 1998;
(6) The September 15, 1998 pay day will be delayed to September 18, 1998; and
(7) Thereafter, pay days will be on the fifth and the twentieth of every month. If the fifth and the twentieth fall on a state holiday, Saturday, or Sunday, the pay day will be the immediately preceding weekday. The implementation of the after-the-fact payroll shall not be subject to negotiation under chapter 89.

prospective injunctive relief seeking to enjoin the implementation of Act 355. Plaintiffs alleged that Act 355 constituted an impairment of their collective bargaining agreement in violation of the Contract Clause, Art. I, § 10 of the United States Constitution.

On June 16, 1998, the district court granted UHPA's motion for preliminary injunction. The court found that Plaintiffs had shown a likelihood of success on the merits, that the possibility of irreparable harm existed, and that the balance of hardships tipped in their favor.

Defendants appealed, moving for a stay of the preliminary injunction pending appeal under Rule 62, Fed.R.Civ.P., which the district court denied. Defendants then moved this court to stay the preliminary injunction, which we denied, also. This appeal ensued.

## STANDARD OF REVIEW

■ "The grant of a preliminary injunction will be reversed only where the district court abused its discretion and based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *FDIC v. Garner*, 125 F.3d 1272, 1276 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 1299, 140 L.Ed.2d 466 (1998). A finding of fact is clearly erroneous when after weighing the entire evidence, the reviewing court is left with "the definite and firm conviction that a mistake has been committed." *Zepeda v. INS*, 753 F.2d 719, 724 (9th Cir.1985) (internal citations and quotation marks omitted).

■ A district court will grant a motion for a preliminary injunction if a party demonstrates either "1) a combination of probable success on the merits and the possibility of irreparable injury, or 2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." *Garner*, 125 F.3d at 1276. "These are not two tests, but rather the opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir.1988) (internal citation and quotation marks omitted).

## DISCUSSION

I Likelihood of Success on the Merits

Article I, § 10, of the Constitution provides: "No State shall ... pass any ... Law impairing the Obligation of Contracts."

■ "A federal cause of action is stated under the contract clause when one alleges that he or she has a contract with the state, which the state, through its legislative authority, has attempted to impair." *E & E Hauling, Inc. v. Forest Preserve District of Du Page County*, 613 F.2d 675, 678 (7th Cir.1980). Plaintiffs claim that Act 355 substantially impairs the obligation of the collective bargaining agreement with the State because it not only changes the employees' pay dates, but removes the whole subject from the bargaining table in violation of Hawaii's labor law. The State, however, argues that although Act 355 arguably might have impaired the performance of the collective bargaining agreement under a breach of contract theory, any obligation under the contract was not impaired.

Our analysis begins with a determination of whether Act 355 "operated as a substantial impairment of a contractual relationship." *General Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992), (*quoting Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). In other words, we must address whether the State, through its legislative authority, enacted Act 355 to impair its contract with Plaintiffs. The Supreme Court has stated that "[t]his inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the im-

pairment is substantial." *Seltzer v. Cochrane*, 104 F.3d 234, 236 (9th Cir.1996) (*quoting General Motors Corp.*, 503 U.S. at 181, 112 S.Ct. 1105).

## A. The Contractual Relationship

■ The first component to be addressed is whether a contractual relationship existed between Plaintiffs and the State. It is undisputed that the collective bargaining agreement is the contractual relationship between Plaintiffs and the State, and that the collective bargaining agreement makes no specific mention of the dates on which Plaintiffs are to be paid. Plaintiffs contend that Act 355 unconstitutionally impairs *implicit* terms of the collective bargaining agreement. Defendants argue that a promise to pay on the fifteenth and last days of the month was not part of the agreement, implicitly or otherwise.[3]

We agree with the district court that even in the absence of any explicit terms in the collective bargaining agreement regarding specific pay days, "[i]t is likely that the timing of the payment of each paycheck is included in the collective bargaining agreement." For over twenty-five years, the State and its employees had a course of dealing under which it was understood that employees would be paid on the fifteenth and last days of every month. A course of dealing can create a contractual expectation. *See Stewart v. Brennan*, 7 Haw.App. 136, 748 P.2d 816, 821 (Haw.Ct. App.1988).

■ We also agree with the district judge that the pay dates were material to the terms of employment and, at the time the collective bargaining agreement was negotiated, the timing of the payroll was a negotiable matter. Under HRS § 89–9(a), wages are a mandatory subject for good faith negotiation, and by implication, so also is the time for payment of wages. In *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the Supreme Court held that employers may not unilaterally implement changes on bargainable topics.[4]

■ The district court's ruling is consistent with the law on the interpretation of collective bargaining agreements. In construing a collective bargaining agreement, not only the language of the agreement is considered, but also past interpretations and past practices are probative. *See Gealon v. Keala*, 60 Haw. 513, 591 P.2d 621, 626 (Haw.1979). We consider an employer's past practices because "[t]he collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The custom and practice of the State had been to pay its employees on the fifteenth and last days of each month. That was the status quo at the time the collective bargaining agreement was entered into.

We affirm the district court's determination that the timing of payment is part of the collective bargaining agreement.

## B. Contract Impairment

■ The second component of the substantial impairment test turns on whether the State has used its law-making powers not merely to breach its contractual obligations, but to create a defense to the breach that prevents the recovery of damages. As one commentator put it:

---

**3.** The parties do not argue whether HRS section 89, the statute creating Hawaii's public employee labor system, itself is a contract that was unconstitutionally impaired. *See United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Therefore, we do not address this issue.

**4.** See *also In the Matter of Hawaii Government Employees Association, Local 152, HGEA/AFSCME, AFL–CIO and George R. Ariyoshi, Governor, et al.*, Decision 63, I HPERB 570 (1975) (Unilateral implementation of seven-day work schedule for Hawaii State Public Libraries is prohibited practice due to Employer's failure to negotiate over staffing).

[T]he question should be whether the modification that the legislation imposes simply breaches the contract like any other unilateral attempt to modify an agreement, or whether the statute prevents or materially limits the contractor's ability to enforce his contractual rights. For example, legislation impairs a public contract only if it prevents or materially limits the remedies that would be available if the contract were between private parties.

Leo Clarke, *The Contract Clause: A Basis for Limited Judicial Review of State Economic Regulation,* 39 U. Miami L.Rev. 183, 234 (1985).

This principle is illustrated in *Horwitz–Matthews, Inc. v. Chicago,* 78 F.3d 1248 (7th Cir.1996). In *Horwitz–Matthews,* a developer sued the City of Chicago under the Contract Clause when the City enacted an ordinance repealing an earlier ordinance that had approved the developer's offer to purchase land and develop it in accordance with the City's plan. *Id.* at 1249.

In analyzing whether an impairment of the Contract Clause had occurred, the Seventh Circuit asked:

[W]hether Chicago, rather than merely breaking the promise it made to [the developer], set up a defense that prevented the promisee from obtaining damages, or some equivalent remedy for the breach.

*Id.* at 1251. The court determined that the City's repeal of the ordinance simply breached the contract created by the original ordinance and that the developer could sue for damages. *Id.* Moreover, the repealing ordinance was "not a defense to a suit for breach of contract...." *Id.* at 1252.

By contrast, in *E & E Hauling,* the plaintiff, a waste hauling company, entered into a contract in 1995 with the Forest Preserve District of DuPage County. In the contract, the plaintiff was given the exclusive right to operate and maintain a sanitary landfill at a recreational preserve and to develop ski hills at the preserve using the technique of sanitary landfill. *E & E Hauling,* 613 F.2d at 677. The contract had no restrictions on the material suitable for deposit. The plaintiff and its customers deposited liquids and sludge at the landfill. In 1978, the District adopted an ordinance that prohibited the deposit of liquids; the ordinance was later amended to prohibit the deposit of any liquid or sewage sludge at the landfill. The District stationed armed guards at the landfill to enforce the ordinance by turning away trucks carrying liquid or sewage sludge. *Id.*

The plaintiff argued that the District's actions in enacting the ordinance impaired its contractual obligation in violation of the Contract Clause. It argued that the ordinance "prevented it from performing under the contract or enforcing its rights thereunder" thus impairing the contract. *Id.* at 678–79.

The District, however, argued that its action only impaired the *performance* of the contract for which a damage remedy was available. *Id.* at 679. On appeal, the Seventh Circuit agreed with the plaintiff's argument and held:

[I]f a state or its subdivision passes a law and through enforcement of it prevents another party from fulfilling its obligation under the contract because the use of the [law] precludes a damage remedy the non-breaching party cannot be made whole. Instead, the law has impaired the obligation of the contract. Use of law normally will preclude a recovery of damages because the law will be a defense to a suit seeking damages unless it is clear the law is not to have that effect.

*Id.* The Seventh Circuit held that the ordinance impaired the contractual rights of the plaintiff because "[i]f the plaintiff sued for damages for a breach of the contract the District could claim that an ordinance prevents it from accepting sludge or liquids. In essence, the ordinance would be a complete defense to a suit for damages." *Id.* at 680.

The Seventh Circuit in *E & E Hauling* relied on the Eighth Circuit's reasoning in *Jackson Sawmill Co. v. United States*, 580 F.2d 302 (8th Cir.1978), to differentiate between a breach of contract and an impairment of contractual obligations. In *Jackson Sawmill*, the City of East St. Louis, Illinois financed the construction of an expressway extension on a bridge across the Mississippi River through a trust agreement with a trust company that issued bonds to fund the project. Later, the City, State of Missouri, and the federal government decided to build another bridge and the bondholders sued on the grounds that the original bridge's loss of revenue from the competing new bridge impaired its contract.

The Eighth Circuit held that the bondholder's action was not a constitutional contract impairment but an ordinary breach of contract action because "no attempt was made to use the law, federal or state, to repudiate a contractual obligation." *Id.* at 312.

■ In the case before us, Act 355 not only adversely affects Plaintiffs' contractual expectations, but it slams the door on any effective remedy. Since under Hawaii law there is no suit in court for breach of a labor agreement, HRS §§ 89–13(a)(8), 89–14;[5] *see also Lepere v. United Public Workers, Local 646, AFL–CIO*, 77 Hawai'i 471, 887 P.2d 1029, 1032 (Haw.1995), Plaintiffs only other conceivable remedies would be a prohibited practice complaint or binding arbitration. These remedies are more theoretical than real. The "prohibited practice" of which Plaintiffs supposedly could complain is not prohibited at all; it is the law under Act 355. And as the district

court noted, Act 355 "provides that this pay lag is not a negotiable matter, thereby precluding the HLRB from invalidating [it]." Likewise, any arbitration award in Plaintiffs' favor would fly in the face of Act 355. It is thus apparent that the State has not merely relieved itself of a contractual obligation, it has eliminated any avenues of redress.

## C. Substantiality of the Impairment

In *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Supreme Court held that an impairment of a contract must be "substantial" for it to violate the Contract Clause.

■ The district court found that "Act 355's impairment of the collective bargaining agreement is likely to be substantial," because a "pay lag would likely impose a substantial hardship on many employees who would not be able to meet their financial obligations such as mortgage payments in a timely manner."

The district court also based its finding that Act 355 substantially impaired the collective bargaining agreement on a line of cases from other jurisdictions that, with one exception, have "agreed that a unilateral reduction in contractually established, future state employee salary obligations constitutes substantial impairment for Contract Clause purposes." *Massachusetts Community College v. Commonwealth*, 420 Mass. 126, 649 N.E.2d 708, 711 (Mass.1995); *see also Condell v. Bress*, 983 F.2d 415 (2d Cir.1993); *Association of Surrogates & Supreme Court Reporters v. New York*, 940 F.2d 766 (2d Cir.1991)

5. HRS § 89–13(a)(8) states:
(a) It shall be a prohibited practice for a public employer or its designated representative wilfully to:
(8) Violate the terms of a collective bargaining agreement.
HRS § 89–14 states:
Any controversy concerning prohibited practices may be submitted to the board in the same manner and with the same effect as provided in section 377–9; provided that

the board shall have exclusive original jurisdiction over such a controversy except that nothing herein shall preclude (1) the institution of appropriate proceedings in circuit court pursuant to section 89–12(e) or (2) the judicial review of decisions or orders of the board in prohibited practice controversies in accordance with section 377–9 and chapter 91. All references in section 377–9 to "labor organization" shall include employee organization.

("*Surrogates I*"); *Association of Surrogates & Supreme Court Reporters v. State*, 79 N.Y.2d 39, 580 N.Y.S.2d 153, 588 N.E.2d 51 (N.Y.1992) ("*Surrogates II*").[6] The Second Circuit has addressed this issue on numerous occasions. In *Surrogates I*, a pay lag statute provided that certain state employees were to be paid nine days' salary for the ten days worked in each pay period for ten two-week periods. 940 F.2d at 772. The two weeks withheld pay would be paid to employees at the termination of their employment with the state. *Id.* The *Surrogates I* court found that the pay lag substantially impaired the collective bargaining agreement between the employees and the state. *Id.*

When the *Surrogates I* court compared the pay lag's deleterious impact on the employees versus the benefits to be derived by the state, it determined that the pay lag would have a "significant and material impact on the employees' working conditions in creating a financial hardship for the employees." *Id.* The court reasoned:

> The affected employees have surely relied on full paychecks to pay for such essentials as food and housing. Many have undoubtedly committed themselves to personal long-term obligations such as mortgages, credit cards, car payments, and the like-obligations which might go unpaid in the months that the lag payroll has its immediate impact.... Indeed, it would be inconsistent for us to accept the defendants' argument that this impairment was necessary because of a fiscal crisis, and to do so by disre-

garding the personal fiscal crises that the lag payroll would create.

*Id.* (citation omitted).

The *Surrogates I* court also considered whether the impairment was "reasonable and necessary to serve an important public purpose." *Id.* at 773. Noting that the Contract Clause "is especially vigilant when a state takes liberties with its own obligations," the Second Circuit held that the impairment was neither reasonable nor necessary in light of alternatives the state could have pursued for the needed funding. *Id.* at 773–74.

Relying on *Surrogates I*, the New York Court of Appeals decided a similar contract impairment issue. *See Surrogates II*, 580 N.Y.S.2d 153, 588 N.E.2d at 51 (N.Y.1992). In *Surrogates II*, the State attempted to off-set anticipated budgetary shortfalls by effecting a five-day pay lag for non-judicial employees, through legislative amendments to the state finance law. *Id.* The pay lag was to be implemented by paying employees for nine days, rather than the ten days employees had worked in five bi-weekly pay periods.

The court held that the impairment of contract created by the pay lag was substantial and "not reasonable and necessary to achieve an important public purpose." *Id.* at 54. The court specifically noted that "withholding 10% of an employee's expected wages each week over a period of ten weeks," "is not an insubstantial impairment to one confronted with monthly debt payments and daily expenses for food and the other necessities of life." *Id.* Thus, the Court of Appeals concluded, the "menu of alternatives" open to the State for reve-

---

**6.** The one exception was the Fourth Circuit's 1993 decision in *Baltimore Teachers Union, American Federation of Teachers Local 340, AFL–CIO v. Mayor and City Council of Baltimore*, 6 F.3d 1012 (4th Cir.1993). In *Baltimore Teachers*, police and teachers brought suit against the City of Baltimore, alleging that salary reductions implemented to meet a budgetary shortfall violated the Contract Clause. The Fourth Circuit reversed the district court and held that the salary reduction plan did not violate the Contract Clause be-

cause the city's furlough program was determined to be reasonable and necessary. This decision has been severely criticized. *See Massachusetts Community College*, 649 N.E.2d at 714, *(citing Baltimore Teachers Union v. Mayor of Baltimore: Does the Contract Clause Have Any Vitality in the Fourth Circuit?*, 72 N.C.L.Rev. 1633, 1644–48 (1994)); *Note, Fourth Circuit Upholds City's Payroll Reduction Plan as a Reasonable and Necessary Impairment of the Public Contract*, 107 Harv. L.Rev. 949, 949 (1994).

nue-raising or revenue-saving, "does not include impairing contract rights to obtain forced loans to the State from its employees." *Id.*

The Second Circuit again addressed a pay lag statute in *Condell v. Bress,* 983 F.2d 415, 419 (2d Cir.1993). In *Condell,* unions sought injunctive relief after the New York State Legislature enacted a statute that imposed a five-day pay lag on executive branch employees such that the employees would receive only nine-tenths of their salary for each of five bi-weekly pay periods. *Id.* at 417. The lagged pay would not be released until the employee died, retired, or left state employment. Already in place was a collective bargaining agreement that provided that paychecks were computed on the basis of ten working days and a continued two-week pay lag that had been negotiated in the previous agreement. *Id.*

As in the *Surrogates* cases, the *Condell* court hinged its analysis on whether the pay lag was "reasonable and necessary notwithstanding the availability of other alternatives." *Id.* at 419. The court concluded that no justification for the use of a pay lag existed because "[j]ust as in *Surrogates I,* other (albeit unpopular) alternatives existed." *Id.* at 420.

Other jurisdictions also have addressed whether a pay lag and similar proposals unconstitutionally impair an agreement between a state and its employees. In *Opinion of the Justices (Furlough),* 135 N.H. 625, 609 A.2d 1204 (N.H.1992), the State of New Hampshire sought to impose a furlough program on state employees that would force them to take non-paid days off. *Id.* at 1206–07. The New Hampshire Supreme Court found that the proposed statute impaired the collective bargaining agreement between the employees and the State because the agreement guaranteed a work week of a certain length and that forcing employees to take unpaid leave violated it. *Id.* at 1209. Relying on *Surrogates I,* the court held that the collective bargaining agreement was substantially impaired because "[i]ts impact would likely

wreak havoc on the finances of many of the affected workers." *Id.* at 1210. The court reasoned: "The legislature had many alternatives available to it, including reducing non-contractual state services and raising taxes and fees. Although neither of these choices may be as politically feasible as the furlough program, the State cannot resort to contract violations to solve its financial problems." *Id.* at 1211.

In *Massachusetts Community College,* the Massachusetts Supreme Judicial Court held that in the face of a valid collective bargaining agreement, the State violated the constitutional prohibition against impairing contracts when to meet a budget deficit, it mandated unpaid furloughs (days off) for certain state employees. 649 N.E.2d at 710.

We agree with these cases. Plaintiffs are wage earners, not volunteers. They have bills, child support obligations, mortgage payments, insurance premiums, and other responsibilities. Plaintiffs have the right to rely on the timely receipt of their paychecks. Even a brief delay in getting paid can cause financial embarrassment and displacement of varying degrees of magnitude.

### D. Defendant's Justification

#### 1. Impairment—Reasonable and Necessary?

■■■] We next must determine whether, even if the collective bargaining agreement were substantially impaired, the impairment was "both reasonable and necessary to fulfill an important public purpose," such that the impairment is justifiable. *Seltzer,* 104 F.3d at 236, (*citing Energy Reserves Group,* 459 U.S. at 411–12, 103 S.Ct. 697). Defendants bear the burden of proving that the impairment was reasonable and necessary because "[t]he burden is placed on the party asserting the benefit of the statute only when that party is the state." *Id.; see also Nevada Employees Ass'n. v. Keating,* 903 F.2d 1223, 1228 (9th Cir.1990).

Defendants claim that the pay lag is reasonable and necessary in light of Hawaii's budgetary crisis. Plaintiffs respond, of course, that it is not, and that the savings anticipated by the State are nothing more than "paper savings" achieved by accounting hocus pocus. They also contend that over a 17–year period, payroll overpayments have been less than $6 per employee annually. The district court found that Defendants failed to show that the pay lag is reasonable and necessary to fulfill an important public purpose. We agree.

To determine reasonableness, we look at the extent of the impairment as well as the public purpose to be served. *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 29, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). On review, we balance "the contractual rights of the individual against the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens." *Surrogates I,* 940 F.2d at 771 (internal citations and quotations omitted).

An impairment may not be considered necessary if there is "an evident and more moderate course" of action that would serve Defendants' "purposes equally well," *see United States Trust Co.,* 431 U.S. at 31, 97 S.Ct. 1505, because "[t]he contract clause of the Federal Constitution limits the ability of a State, or subdivision of a State, to abridge its contractual obligations without first pursuing other alternatives." *See Cliff,* 661 N.Y.S.2d at 739.

A higher level of scrutiny is required to assess "abrogations of government obligations than in the case of legislative interference with the contract of private parties." *Massachusetts Community College,* 649 N.E.2d at 710. Accordingly, we are "less deferential to a state's judgment of reasonableness and necessity when a state's legislation is self-serving and impairs the obligations of its own contracts." *Condell,* 983 F.2d at 418. A less deferential review is employed because "[a] governmental entity can always find a use for extra money, especially when tax-

es do not have to be raised. If a state could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." *United States Trust Co.,* 431 U.S. at 29, 97 S.Ct. 1505.

We agree with the district court that Defendants have not established that Act 355 was both necessary and reasonable. As the district court stated, "[a]lthough perhaps politically more difficult, numerous other alternatives exist which would more effectively and equitably raise revenues." Other options available to Defendants were a federal maximization project (to obtain additional reimbursements from the federal government), additional budget restrictions, the repeal of tax credits, and the raising of taxes. Defendants have not explained why it is reasonable and necessary that the brunt of Hawaii's budgetary problems be borne by its employees.

Also, "[a]n impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred." *Massachusetts Community College,* 649 N.E.2d at 713. Defendants knew of the budgetary crisis at the time the collective bargaining agreement was negotiated and as the history of Act 80 shows, previously had attempted to implement a similar pay lag plan.

## II Irreparable Harm

Defendants contend that the district court erred in finding the possibility of irreparable harm. We agree with the district court that Plaintiffs have met their burden of showing that if the pay lag is implemented, they likely will suffer irreparable harm and that damages, even if available, will not adequately compensate Plaintiffs for hardships caused by the delay in the receipt of pay.

## III Balance of Hardships

The district court held that the balance of hardships in this case weighed

against Defendants. To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it. *See Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1203 (9th Cir.1980).

After weighing the hardships of each party against one another, we conclude that the district court did not err in finding that the balance of hardships tips in favor of Plaintiffs. Moreover, we agree with the district court's determination that there are equally important public interests at stake on both sides so that the factor favors neither party.

## CONCLUSION

We conclude that the district court did not abuse its discretion in granting Plaintiffs' motion for a preliminary injunction. Plaintiffs have shown a likelihood of success on the merits. In addition, the balance of hardships weighs against Defendants; absent a preliminary injunction, irreparable harm to Plaintiffs will likely result.

AFFIRMED.