MEMORANDUM AND ORDER
 

 NICKERSON, District Judge.
 

 In this case, respondents Dennis Yacco and George Quinlan seek cover under the
 
 *239
 
 Eleventh Amendment for overseeing the appropriation of $2.5 million in proceeds from a corporation involved in labor racketeering activities with the Luchese organized crime family. Acting outside normal statutory channels and without judicial oversight or formal public notice, Vacco and Quinlan oversaw the distribution of the forfeiture proceeds to some victims of the crime while denying any share to other victims. A substantial share of the forfeiture proceeds appear to have been subsumed by the office headed by Quinlan.
 

 Unfortunately, the Eleventh Amendment as presently interpreted affords no remedy in this court against the state, no matter how egregious the alleged conduct of state officials. Petitioner’s only avenues of redress lie in state court or against Vacco and Quinlan in their individual capacities.
 

 I
 

 A
 

 Petitioner brought this action pursuant to Federal Rule of Civil Procedure 64 and 42 U.S.C. § 1983 seeking declaratory and injunctive relief in connection with funds previously paid to the New York State Organized Crime Task Force by defendant Amerford International Corporation. Respondents Dennis Vacco and George Quin-lan now move to dismiss the petition, and petitioner cross-moves for partial summary judgment.
 

 B
 

 This is the latest of several proceedings in this Court and elsewhere arising out of corruption and racketeering involving Local 851 of the International Brotherhood of Teamsters (“Local 851”), Amerford International Corporation (“Amerford”), and the Luchese organized crime family, among other parties.
 

 The Parties
 

 Amerford, now known as Thyssen Han-iel Logistics, Inc. (“Thyssen”), is an air freight forwarding business with an office near John F. Kennedy International Airport in Jamaica, Queens. At all pertinent times, Amerford employed members of plaintiff Local 851, whose membership includes clerical workers employed in air freight forwarding business.
 

 Defendant Anthony Razza was Local 851’s secretary and treasurer from February 1990 to January 1994.
 

 Ronald E. DePetris is the court-appointed Independent Supervisor of Local 851 who brought this action on the union’s behalf.
 

 Respondent Dennis Vacco was Attorney General for the State of New York until December 31, 1998. Respondent George Quinlan was at all relevant times Deputy Attorney General in charge of the New York State Organized Crime Task Force. Vacco and Quinlan are sued in both their individual and official capacities.
 

 United States v. Local 295
 

 On March 20, 1990, the United States brought a civil action in this Court pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961
 
 et seq. United States v. Local 295, International Brotherhood of Teamsters,
 
 90 cv 970. The complaint alleged in part that Local 851, Local 295, and others had engaged with the Luchese and Gambino organized crime families in labor racketeering and other unlawful practices revolving around the air freight industry at JFK Airport.
 

 On October 17, 1994, this Court approved a consent decree in
 
 United States v. Local 295.
 
 The decree enjoined Local 851 from engaging in racketeering or associating with members of organized criminal groups, and provided for oversight of Local 851 by a union Trustee and an Independent Investigator. The Court subsequently appointed DePetris as Independent Investigator.
 

 
 *240
 

 The Amended Complaint
 

 On December 21, 1995, DePetris filed the underlying complaint in this action on behalf of Local 851 against Amerford, Thyssen and Razza. The amended complaint alleged substantially the following.
 

 Amerford facilitated and profited from both a pattern of racketeering activity and Razza’s violation of his fiduciary duties to Local 851. In particular, in December 1990, Amerford terminated twenty employees who were members of Local 851 (the “1990 layoffs”), and paid a percentage of the resulting savings in labor costs to the Luchese organized crime family. Raz-za, a member of the Luchese family, agreed to this plan and used his position as an officer in Local 851 to maintain labor peace following the 1990 layoffs.
 

 Razza and Amerford concealed this scheme from the union and others by inventing sham justifications for the layoffs, disguising payments made to the Luchese family, and submitting false affidavits to the National Labor Relations Board, which was investigating the layoffs. Razza also submitted false affidavits regarding Amer-ford to this Court in connection with
 
 United States v. Local 295.
 

 The amended complaint asserted three claims against Razza, Amerford, Thyssen, and Thyssen’s parent company. Counts One and Two allege that these defendants and members of the Luchese family violated RICO by engaging in illegal labor payoffs, money laundering, and obstruction of justice. As damages, plaintiffs sought to recover the salary Local 851 paid to Razza; attorneys’ fees and costs incurred in defending the union in
 
 United States v. Local 295
 
 and in pursuing this case; the cost of compensating the Independent Supervisor and funding his activities; and treble damages.
 

 Count III alleged that Amerford induced and participated in Razza’s breach of his fiduciary duty to Local 851 in violation of New York Labor Law § 725. Plaintiffs sought the same recovery under Count III as under Counts I and II, and also sought to hold Amerford and Razza jointly and severally liable for the gains or profits resulting from these violations.
 

 The 1998 Consent Order
 

 In a consent order signed by this Court on June 16, 1998 (the “Consent Order”), Local 851 settled the claims against Thys-sen and Amerford. In settlement of Counts I and II, Amerford and Thyssen agreed to pay, and has since paid, $1.2 million to plaintiffs.
 

 In settlement of Count III, Amerford stipulated that it was liable to plaintiff for $2 million, representing gains and profits made as a result of Amerford’s participation in the New York labor law violation. Amerford also consented to an order directing that an award of $2 million be entered against Amerford “as restitution, reparations and damages to Local 851 as a victim of the schemes alleged in ... the Amended Complaint.”
 

 The Consent Order specified that the award against Amerford could be satisfied solely from an apportionment of a $2.5 million Forfeiture Fund Amerford had previously paid to the Task Force, as discussed below. The Consent Order authorized Independent Supervisor was authorized to initiate proceedings to recover the money from the Forfeiture Fund.
 

 The Consent Order further specified that “this Court shall retain jurisdiction over this action to the extent of supervising compliance with this Consent Order.”
 

 Respondents claim that the parties to the Consent Order never consulted the Task Force about the terms of that order before submitting it to the Court.
 

 The Task Force Agreement
 

 While the federal proceedings that culminated in
 
 Local 295
 
 and this action were underway, the New York State Organized Crime Task Force (the “Task Force”) was conducting its own investigation of organized crime infiltration of Local 851 and
 
 *241
 
 Amerford’s role in resulting labor law violations.
 

 On June 30, 1993, Amerford and the Task Force entered a written agreement (the “Task Force Agreement”) which provided in pertinent part as follows. The parties agreed to waive any requirement that it obtain a criminal conviction before obtaining a forfeiture from against Amer-ford. In return, Amerford agreed to pay $2.5 million to the Task Force in settlement of its forfeiture liability (the “Forfeiture Fund”).
 

 Through an Independent Private Inspector General appointed by the Task Force, the Task Force would distribute the Forfeiture Fund in accordance with Article 13-A of the New York Civil Practice Law and Rules (“Article 13-A”). Such distribution would include restitution to past and present Amerford employees for the company’s alleged improper labor activities in amounts to be determined by the Inspector General. If the total amount of restitution exceeded $1 million, Amerford would contribute additional sums to the Forfeiture Fund.
 

 The parties would enter into a consent decree within two weeks of execution of the Task Force Agreement providing for the distribution of the Forfeiture Funds pursuant to Article 13-A.
 

 No such decree was ever executed, and neither the Task Force Agreement nor the Task Force’s administration of the Forfeiture Fund has ever been subjected to any state judicial oversight.
 

 The Disposition of the Settlement Fund,
 

 The Task Force claims that, between 1993 and 1998, it distributed $365,805.26 of the Forfeiture Fund to individual members of Local 851 fired by Amerford in the 1990 layoffs.
 

 The Task Force also says that, on an unspecified date, the Local 851 Employer Group’s Pension and Welfare Funds sought a portion of the Forfeiture Fund from the Task Force to compensate for unpaid contributions and other damages in connection with the 1990 layoffs. In a written agreement dated November 18, 1994 between the Task Force and Amer-ford, the Task Force agreed to pay $50,000 from the Forfeiture Fund to the Inspector General in settlement of these claims. The agreement also stated that Amerford would “make no further claim for payments out of the [Forfeiture Fund].” The Task Force claims that it subsequently distributed $50,000 of the Fund pursuant to this agreement.
 

 The Task Force also says it has distributed $651,302.95 to the New York Office of Alcoholism and Substance Abuse.
 

 As of February 10,1999, the Task Force said that only $53,877 remained in the Forfeiture Fund. Petitioners allege that the Task Force kept the remaining sum, approximately $1.4 million, for itself. Respondents have not admitted this directly, but asserted at the hearing on this motion that they had authority as the “state claiming authority” to retain the remaining funds.
 

 Respondents have submitted no affidavits or documentary evidence indicating the disposition of the unspent portions of the Fund.
 

 Local 851 ’s Petition
 

 On behalf of Local 851, the Independent Supervisor filed the present petition on August 25, 1998. The petition alleges in substance as follows.
 

 Local 851, as a victim of Amerford’s crimes, is entitled under Article 13-A to an apportionment of the $2.5 million in forfeiture proceeds obtained by the Task Force in connection with those crimes. Under the Consent Order in the federal case, the amount of Local 851’s apportionment should be $2 million. Local 851’s stake in the Forfeiture Fund amounts to a cognizable property right or interest by virtue of Afiele 13-A and Amerford’s assignment to Local 851 of its interest in the Fund.
 

 On March 18, 1996, the Independent Supervisor met with members of the Task
 
 *242
 
 Force and inquired about the Task Force’s investigation of Amerford and the existence of a settlement agreement between Amerford and the Task Force regarding Amerford’s forfeiture liability. The Task Force refused to provide such information and intentionally withheld the fact that Amerford had already made payments to the Task Force pursuant to the Task Force Agreement.
 

 The Task Force finally provided Local 851 with a copy of the Task Force Agreement pursuant to a Stipulated Protective Order dated February 27,1997.
 

 On June 25, 1998, the Independent Supervisor met with representatives of the Task Force and requested a disbursement of $2 million from the Forfeiture Fund pursuant to Article 13-A. Respondent Quinlan subsequently told the Independent Supervisor that he was consulting respondent Vacco regarding the request. On August 12, 1998, Quinlan informed the Independent Supervisor that the request had been denied.
 

 The Task Force has no title to any portion of the Fund until after a judgment, order or decree of forfeiture pursuant to Article 13-A. Such a judgment, order or decree, in turn, can only be entered after distribution of forfeiture funds to victims, also pursuant to Article 13-A.
 

 The Task Force has never filed with any court a consent decree of forfeiture, despite being required to do so by the Task Force Agreement and by Article 13-A. Nor has the Task Force complied with the provisions of Article 13-A requiring public notice and accountability in settlement of forfeiture actions and distribution of forfeiture funds.
 

 The Task Force has nevertheless exercised dominion and control over the Forfeiture Fund, and in fact has appropriated over half of the fund for itself. In addition, while the Task Force initially intended to set aside only $500,000 of the Fund to compensate victims of Amerford’s crimes, less than $500,000 has gone to victim compensation, and less than $100,-000 remains of the amount set aside for that purpose.
 

 The Task Force’s conduct in appropriating and withholding the portion of the Forfeiture Fund due to Local 851 constitutes an ongoing violation of the Fourteenth Amendment and 42 U.S.C. § 1983.
 

 The petition seeks declaratory and in-junctive relief, including a determination of the amount of the Forfeiture Fund to which it is entitled and an order requiring respondents to deposit that amount into the registry of this Court in order to secure satisfaction of a judgment against Amerford.
 

 II
 

 Respondents now move to dismiss the petition pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) as barred by the Eleventh Amendment, for lack of subject matter jurisdiction, and for failure to state a Due Process claim.
 

 Petitioners cross-move for partial summary judgment on whether respondents acted
 
 ultra vires
 
 and whether petitioners have been and continue to be deprived of their Due Process rights. Petitioners’ cross-motion also asks the Court to enjoin respondents from continuing to withhold the funds and direct them to deposit $2 million into the registry of the Court.
 

 Because both parties have submitted matters outside the pleadings on the issues that govern the Court’s decision, respondent’s motion will be considered one for summary judgment.
 
 See
 
 Fed.R.Civ.P. 12(b).
 

 Under Rule 56 of the Federal Rules of Civil Procedure, the moving party is entitled to summary judgment “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c).
 

 
 *243
 
 III
 

 A
 

 The Eleventh Amendment prohibits federal courts from entertaining suits by a private party against a state in the absence of waiver or a valid congressional override.
 
 See Seminole Tribe of Florida v. Florida,
 
 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). The Eleventh Amendment also bars suits against state officials in their official capacity “when the state is the real, substantial party in interest,” regardless of whether the state is named as a party.
 
 Pennhurst State School & Hospital v. Halderman,
 
 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984);
 
 see Farid v. Smith,
 
 850 F.2d 917, 921 (2d Cir.1988).
 

 The Eleventh Amendment does not prohibit suits against state officers alleged to have acted
 
 ultra vires,
 
 meaning without statutory authority or under color of an unconstitutional statute, even though the relief would operate against the state.
 
 See Florida Dep’t of State v. Treasure Salvors, Inc.,
 
 458 U.S. 670, 684-90, 102 S.Ct. 3304, 3314-17, 73 L.Ed.2d 1057 (1982);
 
 Ex parte Young,
 
 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
 

 There are two important exceptions to this
 
 “ultra vires
 
 ” doctrine. First, an official acts
 
 ultra vires
 
 only where “there [is] no colorable basis for the exercise of authority” at issue.
 
 Pennhurst,
 
 465 U.S. at 101, n. 11, 104 S.Ct. at 908, n. 11 (1984). A valid
 
 ultra vires
 
 claim rests on “the officer’s lack of delegated power, [while] a claim of error in the exercise of that power is therefore not sufficient” to evade a sovereign immunity defense.
 
 Larson v. Domestic & Foreign Commerce Corp.,
 
 337 U.S. 682, 690, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949).
 

 Second, even where a state official has acted
 
 ultra vires
 
 or in violation of federal law, the Eleventh Amendment restricts the available relief.
 
 See Treasure Salvors,
 
 458 U.S. at 689-90, 102 S.Ct. at 3317;
 
 Edelman v. Jordan,
 
 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). When state funds are awarded to compensate for past wrongdoing by state officials, the Eleventh Amendment bars the payment as retrospective, even where the relief is styled as equitable restitution or some other form injunctive relief.
 
 See Edelman
 
 at 665, 94 S.Ct. at 1357;
 
 Tekkno Laboratories, Inc. v. Perales,
 
 933 F.2d 1093 (2d Cir.1993). “Any claim for retroactive monetary relief, under any name, is barred.”
 
 Kostok v. Thomas,
 
 105 F.3d 65, 69 (2d Cir.1997).
 

 On the other hand, “[rjemedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring supremacy of that law.”
 
 Green v. Mansour,
 
 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985). Such prospective relief is available even where it may have “a future financial effect on a state treasury, even if the amount is substantial.”
 
 New York City Health & Hospitals Corporation v. Perales,
 
 50 F.3d 129, 134-35 (2d Cir.1995);
 
 see Milliken v. Bradley,
 
 433 U.S. 267, 289, 97 S.Ct. 2749, 2761-62, 53 L.Ed.2d 745 (1977). “Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in
 
 Ex parte Young.” Edelman,
 
 at 668, 94 S.Ct. at 1358.
 

 There is no dispute that, to the extent the petition is directed at respondents in their official capacity, this action must be considered one against the state unless an exception can be found. Petitioner argues that the Eleventh Amendment does not bar this suit because (1) Vacco and Quinlan acted
 
 ultra vires,
 
 and (2) the petition seeks only prospective relief to remedy an ongoing constitutional violation.
 

 B
 

 Petitioner’s
 
 ultra vires
 
 argument is based on the Task Force’s alleged appropriation of the Forfeiture Fund without any statutory or other authorization. Spe
 
 *244
 
 cifically, respondents allegedly bypassed the statutory scheme governing civil forfeiture proceedings in favor of a private agreement to immunize a wealthy corporate suspect from criminal prosecution in return for $2.5 million. The Task Force kept over half of that money for itself, allegedly at the expense of at least some of the victims of the underlying crime.
 

 Article 13-A allows a “claiming authority” to bring a forfeiture action in state court to recover the proceeds of criminal conduct.
 
 See
 
 N.Y.C.P.L.R. § 1310
 
 et seq.
 
 The claiming authority is directed to distribute forfeited assets to compensate victims of the underlying crime, fund state substance abuse programs.
 
 See id.
 
 § 1349(2)(a) -(f). Any remaining proceeds are to be deposited in designated law enforcement funds.
 
 See id.
 
 § 1349(2)(g) -(h).
 

 As an arm of the state attorney general, the Task Force has authority to act as a “claiming authority” under Article 13-A.
 
 See
 
 N.Y.C.P.L.R. § 1310(11), (14);
 
 Goldstock v. Restrepo,
 
 601 N.Y.S.2d 258, 330 (N.Y.Sup.1993). As such, it may initiate forfeiture proceedings, reach settlement agreements, and collect and distribute forfeited assets.
 
 See
 
 N.Y.C.P.L.R. §§ 1311(1), (11), 1349.
 

 Respondents admit that they did not follow the scheme set forth in Article 13-A, but they say they were not required to do so and so did not act
 
 ultra vires.
 
 This argument proceeds substantially as follows. The Task Force has full discretion to enter settlement agreements with criminal suspects. The Task Force Agreement was thus an “enforceable executory contract,” the terms of which were within the parties’ discretion and not dictated by Article 13-A. Except as provided in the Agreement, the Task Force was not required “to follow any other provision of state forfeiture law.”
 

 Based on the private, voluntary nature of the Agreement, respondents say that any failure to comply with its provisions, including those requiring adherence to Article 13-A, constituted a breach of contract or an abuse of discretion rather than an
 
 ultra vires
 
 act.
 

 This argument’s weakest link is the first one, namely, the nature of the Task Force’s putative authority to enter into settlement agreements. Respondents say this authority is “incidental” to the Task Force’s power under Executive Law 70-a(l)(a) to “conduct investigations and prosecutions of organized crime activities.”
 

 Of course, to immunize fully their conduct in this case, respondents’ “incidental” powers must extend well beyond run-of-the-mill civil settlements. Such powers must go so far as to enable the Task Force to opt out of otherwise mandatory provisions of state law; to appropriate criminal proceeds and distribute them as it sees fit, including to itself; to determine in its own discretion who qualifies as a victim of the underlying crime and summarily deny recovery to other purported victims; and to do so with no judicial oversight or public notice.
 

 Not surprisingly, the Task Force has no such authority under state law. “[A]s a creature of the State, the Task Force has no power other than that given it by the Legislature, either explicitly or by necessary implication.”
 
 B.T. Productions, Inc. v. Barr,
 
 44 N.Y.2d 226, 405 N.Y.S.2d 9, 376 N.E.2d 171 (N.Y.1978) (emphasis added). The powers exercised by respondents in this case are not explicitly set forth in the Executive Law or anywhere else. Nor can they plausibly be considered “necessary implications” of the power to conduct criminal investigations and prosecutions under Executive Law § 70-a(l)(a).
 

 In
 
 B.T. Productions, Inc.,
 
 by comparison, Task Force members seized property belonging to an apparent investigatory target without obtaining a warrant in the manner set forth in Executive Law § 70-a. The court ordered the property returned, holding that the Task Force had subjected the plaintiff to an ongoing and
 
 ultra vires
 
 deprivation of property.
 

 
 *245
 
 Respondents compare their authority to settle forfeiture actions to the implied power of prosecutors to enter plea bargains and “release-dismissal” agreements, in which prosecutors dismiss criminal charges in return for a release from civil liability for police misconduct or other potential actions.
 

 These analogies are inapt. The Task Force’s power to initiate and settle forfeiture proceedings is explicitly set forth in Article 13-A, along with important limitations and controls on that power. Having altogether ignored these limitations, respondents now seek cover under an attenuated, but comparatively liberating, theory of “implied” authority.
 

 In addition, plea bargains do not involve conflicts of interest as blatant as those in this case. Both the Supreme Court and the New York Court of Appeals have required judicial scrutiny of release-dismissal agreements precisely because of such conflicts.
 
 See Newton v. Rumery,
 
 480 U.S. 386, 401, 107 S.Ct. 1187, 1196, 94 L.Ed.2d 405 (1987) (O’Connor, J., concurring) (in release-dismissal agreements, “public criminal justice interests are explicitly traded against the private financial interest of the individuals involved in the arrest and prosecution”);
 
 Cowles v. Brownell,
 
 73 N.Y.2d 382, 387, 540 N.Y.S.2d 973, 975, 538 N.E.2d 325 (1989) (refusing to enforce release-dismissal agreement as contrary to the “integrity of the criminal justice system”).
 

 That such concerns are equally present in the context of forfeiture settlements is best demonstrated by the facts of this case. The dismissal of criminal charges here was contingent upon a $2.5 million dollar payment. The Task Force apparently intended all along to keep $1.5 million of that sum for itself: the Task Force Agreement provided that Amerford would pay additional monies if the restitution claims exceeded $1 million.
 

 Parenthetically, this aspect of the Agreement also casts doubt on Amerford’s good faith. In the Consent Order, Amer-ford agreed that it was liable to Local 851 for $2 million, to be satisfied “solely” from the amount “previously paid” in establishing the Forfeiture Fund. But Amerford had already pledged, in the Task Force Agreement, to supplement the Forfeiture Fund for any claims exceeding $1 million. The amount of “previously paid” monies available in the Fund to pay Local 851 and other victims was thus capped at $1 million.
 

 As a result, at least half of the $2 million pledged by Amerford to Local 851 in the Consent Order was by definition unavailable under the terms of the Task Force Agreement. Amerford had already taken away with one hand what it gave to Local 851 with the other. The Court makes no finding here as to the effect of this discrepancy on the validity of the Consent Order or the availability of recovery from Amer-ford.
 

 Article 13-A includes several provisions designed to check potential abuses and conflicts of interest. On the present record, respondents appear to have obeyed
 
 none
 
 of these provisions. For example, the Task Force did not initiate a formal forfeiture proceeding, and Amerford was never an Article 13-A defendant.
 
 Cf.
 
 N.Y.C.P.L.R. § 1311(5) (“No person shall forfeit any right, title, or interest in any property who is not a defendant” in an action initiated pursuant to § 1311(5)). The Task Force also purported to “waive” the requirement that a criminal conviction be obtained before assets are finally forfeited.
 
 Cf. id.
 
 at § 1311(l)(a) (court
 
 “may not
 
 grant forfeiture” prior to conviction) (emphasis added).
 

 In addition, the settlement agreement was never filed with the clerk of the court or reported to the state crime victims board.
 
 Id.
 
 at § 1311(11). In fact, there is plausible evidence that respondents affirmatively concealed the existence of the Task Force Agreement and the Forfeiture Fund from petitioner. When respondents finally did produce a copy of the Agree-
 
 *246
 
 merit, they insisted that it be kept confidential.
 

 Respondents do claim to have followed the order of distribution set forth in § 1349. But they say they did so only pursuant to the Task Force Agreement, not because of any statutory obligation. They also say that neither state law nor the Task Force Agreement required them to comply with any other provision of Article 13-A.
 

 This argument is suspect at best. Paragraphs Three, Four and Five of the Task Force Agreement require the parties to act “under” and “in accordance with” “Article 13-A.” None of these provisions are limited to § 1349.
 

 More to the point, respondents decidedly did
 
 not
 
 adhere to § 1349. That section provides for distribution of forfeiture proceeds pursuant to a “judgment or order of forfeiture.”
 
 Id.
 
 at §§ 1349(1), (2);
 
 see also
 
 Peter Preiser, Practice Commentary, N.Y.C.P.L.R. § 1349 (McKinneys 1997) (“[disposition of the forfeited assets is subject to approval of the court”). The Task Force Agreement also required entry of a consent order governing distribution. No such order was obtained. In fact, respondents now dismiss any requirement for judicial oversight as “ministerial” and irrelevant to the validity of their disposal of the Forfeiture Fund.
 

 Moreover, § 1349 provides for reimbursement of the claiming authority’s expenses from forfeiture proceeds only after complete victim restitution, and only “in satisfaction of actual costs and expenses.”
 
 Id.
 
 § 1349(d) -(f) (emphasis added). After all such distributions have been made, any remaining proceeds are deposited into specified accounts for use in law enforcement and prosecution. “There is no indication that these funds [may be] received for the personal benefit of the claiming authority.” State Comptroller Opinion No. 95-8,1995 WL 370307 at * 3 (April 18, 1995). The claiming authority must report all allotments made pursuant to § 1349 to the state crime victims board, among other entities.
 

 Respondents assert, without providing documentary proof, that the Task Force disbursed approximately $365,000 to individual members of Local 851 as victims of Amerford’s conduct; $50,000 to the Local 851 Health and Welfare Funds; and $650,-000 to the state substance abuse fund. They also claim that only $53,000 remained in the fund as of March 19, 1999. The location of the remaining $1.4 million is unclear, although respondents says the Task Force retained an unspecified amount to cover its expenses.
 

 There is no evidence that only “actual” expenses were reimbursed, or that any monies were deposited into the specified law enforcement funds, as opposed to the Task Force’s own purse. Moreover, respondents do not even assert that they reported any disbursements to the crime victims board. Under respondents’ approach to civil forfeiture, the claiming authority may collect and spend its bounty entirely without judicial or public oversight.
 

 To the extent that the Task Force honored the order of priority in § 1349 at all — and its alleged failure to do so forms the gravamen of this action — it did so unhampered by the checks and balances built into the broader statutory scheme of Article 13-A. The argument that adherence to that scheme was entirely discretionary, and that the Task Force could ignore statutory requirements it deemed “ministerial” or inconvenient, merely underscores respondents’ cavalier attitude toward the rule of law.
 

 Finally, respondents assert that their conduct was consistent with public policy. They point out that the Task Force used the Forfeiture Fund to compensate individual victims of Amerford’s actions, provide funding for state alcohol and drug-abuse programs, and cover the expenses of valuable criminal investigation and prosecution activities.
 

 
 *247
 
 The public good, in this unusual formulation, is entirely self-defined by the executive officials whose actions are being challenged. It is perhaps not coincidental that the primary financial beneficiary of the public good as so defined is the Task Force itself. In any event, the question in this case is not the Task Force’s benevolence but the legality of its acts.
 

 In short, petitioner does not seek to vindicate a property interest arising solely from a disputed contract, as respondents urge.
 
 Cf. Larson,
 
 337 U.S. at 701-02, 69 S.Ct. at 1467. Rather, they seek recovery of property withheld by state officials without any plausible statutory or other legal authority.
 
 Cf. Treasure Salvors,
 
 458 U.S. at 687, 102 S.Ct. at 3315-16.
 

 “[T]he Eleventh Amendment provides no immunity to officers or agents of a State in withholding the property of a citizen without the authority of law.”
 
 Tindal v. Wesley,
 
 167 U.S. 204, 222, 17 S.Ct. 770, 777, 42 L.Ed. 137 (1897). Respondents thus acted
 
 ultra vires
 
 for purposes of the Eleventh Amendment.
 
 See Pennhurst,
 
 465 U.S. at 101, n. 11, 104 S.Ct. at 908;
 
 Ex parte Young,
 
 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
 

 C
 

 Respondents also argue that this action is barred by
 
 Pennhurst.
 
 The Court in
 
 Pennhurst
 
 held that the
 
 Ex parte Young
 
 doctrine, which allows federal courts to enjoin unlawful conduct by state officials, is inapplicable where the officials are alleged to have violated state law alone.
 
 Pennhurst,
 
 465 U.S. at 104-06, 104 S.Ct. at 910-11;
 
 see Allen v. Cuomo,
 
 100 F.3d 253, 260 (2d Cir.1996).
 

 This rule does not apply where, as here, an official has allegedly acted entirely outside his state-delegated authority in a manner that violates federal law.
 
 See Treasure Salvors,
 
 458 U.S. at 696-97, 102 S.Ct. at 3320-21;
 
 Pennhurst,
 
 465 U.S. at 101, n. 11, 104 S.Ct. at 908, n. 11.
 

 Were the court to reach the merits of this action, it would of course be required to apply state law in determining whether petitioner has a property interest in a portion of the Forfeiture Fund by virtue of Article 13-A. But this determination would be integral to resolving a federal question, namely, whether respondents deprived petitioner of its property without due process.
 
 See e.g., Logan v. Zimmerman Brush Co.,
 
 455 U.S. 422, 429-32, 102 S.Ct. 1148, 1154-56, 71 L.Ed.2d 265 (1982) (state-created right to adjudicatory procedure created constitutionally protected property right).
 

 “A state law issue that is preliminary to a federal claim against a state official is not a pendent state law claim that
 
 Pennhurst
 
 prevents a federal court from adjudicating.”
 
 Fleet Bank, Nat’l Ass’n v. Burke,
 
 160 F.3d 883, 891 n. 6 (2d Cir.1998).
 

 D
 

 As noted, even where state officers are alleged to have acted
 
 ultra vires,
 
 the Eleventh Amendment prohibits a federal court from “compel[ling] the State to use its funds to compensate the plaintiff for the[ir] injury.”
 
 Treasure Salvors,
 
 458 U.S. at 689-90, 102 S.Ct. at 3317;
 
 New York City Health & Hospitals Corporation v. Perales,
 
 50 F.3d 129, 134 (2d Cir.1995) (even where the state is not named as a defendant, the Eleventh Amendment bars “those actions where liability, if imposed, must be paid from the state fisc”).
 

 But the Court may enjoin an ongoing or future constitutional violation, even where such relief requires the expenditure of state funds, provided that the financial effect is ancillary to permissible prospective relief.
 
 Edelman,
 
 415 U.S. at 667-68, 94 S.Ct. at 1357-58.
 

 In short, prevailing Eleventh Amendment doctrine “permit[s] prospective relief and bar[s] retroactive relief.”
 
 New York City Health & Hospitals Corporation v. Perales,
 
 50 F.3d 129, 135 (2d Cir.1995).
 

 
 *248
 
 The line between permissible prospective relief and prohibited retroactive relief “will not in many instances be that between night and day.”
 
 Edelman
 
 at 667, 94 S.Ct. at 1357. Indeed, the Second Circuit has compared applying this distinction to “examining a subject in that half-light called the gloaming, ■ where to identify it accurately one needs to have the instincts of Argos, Odysseus’ dog, who recognized his master dressed as a beggar upon his return home after 20 years’ absence.”
 
 New York City Health & Hospitals Corporation,
 
 50 F.3d at 130 (2d Cir.1995). '
 

 Petitioner seeks declaratory and injunc-tive relief, including declaratory judgment regarding the portion of the Forfeiture Fund to which it is entitled and an order requiring respondents to deposit that amount in the Court’s registry.
 

 Respondents argue that any payment in this case would constitute “compensatory damages or restitution from the State treasury,” and thus be barred by the Eleventh Amendment. Petitioner, in contrast, characterizes its injury as ongoing, the relief sought as prospective, and any impact on the state treasury as ancillary.
 

 1
 

 The starting point in discerning prospective from retroactive relief is to determine when the alleged constitutional injury occurred.
 
 See Papasan v. Allain,
 
 478 U.S. 265, 282, 106 S.Ct. 2932, 2942, 92 L.Ed.2d 209 (1986) (Eleventh Amendment bars awards for “accrued monetary liability”);
 
 New York City Health & Hospitals Corporation, 50
 
 F.3d at 130 (“retroactive-prospective dichotomy” hinges upon “when ... the injury ... occurs”).
 

 Petitioner concedes that their injury here — namely, the withholding by respondents of Local 851’s share of the Forfeiture Fund — has “ripened,” that is, that they have a present property interest in a portion of the Fund. Whether this interest arose on the date the Fund was created, the date of the Consent Order Local, or the dates on which petitioner sought or was denied its share from respondents, is immaterial, according to petitioner. What matters is that the injury is ongoing in that their property is still illegally in the hands of the state.
 

 Petitioner relies for this argument on
 
 Condell v. Bress,
 
 983 F.2d 415 (2d Cir.1993) and
 
 Association of Surrogates and Supreme Court Reporters v. State of New York,
 
 940 F.2d 766 (2d Cir.1991). Both cases involved “lag payroll” systems under which New York State withheld a designated portion of the salary of affected employees, to be repaid upon termination of employment. The district courts in each case enjoined future operation of the lag payroll system and ordered the state to release the withheld salary. The Second Circuit in each case affirmed, despite the impact of the release order on the state treasury.
 
 Condell,
 
 983 F.2d at 420;
 
 Surrogates,
 
 940 F.2d at 774.
 

 The return of withheld salary under these circumstances was prospective, according to the court, because “the money was withheld, continues to be withheld, and will remain withheld until the employees leave State employ.”
 
 Condell,
 
 983 F.2d at 420. In other words, even after future operation of the lag payroll was enjoined, the deferral would roll over — and the constitutional injury would be inflicted anew — with each paycheck.
 

 The return of the withheld salary was thus ancillary to the non-monetary injunction. As the court stated in
 
 Surrogates,
 
 “since we enjoin the lag-payroll law (a purely prospective remedy), the state defendants, ‘in order to shape their official conduct to the mandate of the court’s decrees,’ will have to restore the withheld monies to the affected employees.” 940 F.2d at 774 (citations omitted);
 
 Condell,
 
 983 F.2d at 420.
 

 Petitioner argues that, like the deferred salaries in
 
 Condell
 
 and
 
 Surrogates,
 
 the monies to which it is entitled “have been and continue to be withheld by state officials on an unconstitutional basis.” The Task Force has refused and continues to
 
 *249
 
 refuse petitioner’s request for an apportionment of the Forfeiture Fund. But this alleged injury does not periodically recur in the same way as a salary deferment. Nor does petitioner seek injunctive relief
 
 apart from
 
 the order to restore funds. In
 
 Condell
 
 and
 
 Surrogates,
 
 by contrast, enjoining future operation of the lag payroll by definition required restoration of the deferred salary.
 

 Under petitioner’s view, any award of money would be prospective in that failure to grant such relief would leave the injury unremedied. But the Eleventh Amendment views prospective relief quite differently.
 

 This case is more analogous to decisions involving wrongfully withheld public benefits. In
 
 Edelman,
 
 for instance, the Supreme Court struck down an order requiring state officials to “release and remit” illegally withheld welfare benefits while upholding an injunction against future violations. 415 U.S. at 656, 668-69, 94 S.Ct. at 1352, 1358;
 
 see also Yorktown Medical Laboratory v. Perales,
 
 948 F.2d 84, 87-88 (2d Cir.1991) (federal court may not order state to make previously withheld payments to Medicare providers);
 
 Tekkno Laboratories, Inc. v. Perales,
 
 933 F.2d 1093 (2d Cir.1993) (same);
 
 Rothstein v. Wyman,
 
 467 F.2d 226 (2d Cir.1972) (federal court may not compel state to restore welfare payments).
 

 Tekkno Laboratories
 
 is particularly on point. The district court in that case enjoined state officials from withholding Medicaid payments pending review by of plaintiffs’ reimbursement claims. Plaintiff categorized this relief as an order “that the illegal deprivation shall not continue to Tekkno’s further injury.”
 
 Id.
 
 The Second Circuit rejected this view, holding that a federal court had “no power in light of the Eleventh Amendment to award past-due welfare benefits that ‘should have been paid but were not.’ ” 933 F.2d at 1098.
 

 No principled distinction can be drawn between the benefits cases and this one. As in those cases, petitioner seeks to recover monies illegally withheld by state authorities, monies in which petitioner plausibly claims to have a property interest. As in those cases, the state’s failure to follow statutory procedures for distributing such money led to the injury.
 

 Furthermore, as in the benefits cases, petitioner characterizes the relief sought as incidental to an injunction against future unlawful conduct. But the return of Local 851’s share of the Forfeiture Fund is not “ancillary” to other injunctive relief; it is the relief itself.
 
 Cf. Papasan,
 
 478 U.S. at 281, 106 S.Ct. at 2942 (barring relief for “ongoing liability for past breach of trust” as indistinguishable from “breach of a continuing obligation to comply with trust obligations”).
 

 It is immaterial that petitioner does not express its prayer for relief in terms of money damages. Instead it seeks an order to “restore” monies to the Court’s registry for satisfaction of the judgment against Amerford. In divining permissible from impermissible relief, the Court “look[s] to the substance rather than to the form of the relief sought.”
 
 Papasan,
 
 478 U.S. at 278, 106 S.Ct. at 2940;
 
 see New York City Health and Hospitals Corporation,
 
 50 F.3d. at 135 (“nature” of requested relief governs, “not the label placed on it”). “Any claim for retroactive monetary relief, under any name, is barred.”
 
 Kostok v. Thomas,
 
 105 F.3d 65, 69 (2d Cir.1997).
 

 The Second Circuit has expressly rejected similar efforts.
 
 See Yorktown,
 
 948 F.2d at 87;
 
 id.
 
 at 87-88 (rejecting plaintiffs categorization of disbursal of overdue Medicare payments as “the return of property, — and holding that the Eleventh Amendment does not recognize a distinction “between monetary damages and money in which plaintiff has a property interest” ”);
 
 cf. Ford
 
 (taxes);
 
 In re New York (I),
 
 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921) (action for damages against the state that would otherwise be barred by Eleventh Amendment cannot be
 
 *250
 
 maintained through seizure of state property).
 

 Petitioner also relies on
 
 Polanco v. U.S. Drug Enforcement Administration,
 
 158 F.3d 647, 652 (2d Cir.1998), in which the Second Circuit upheld that an award of equitable relief, including the return of wrongfully seized monies. But
 
 Polanco
 
 involved federal sovereign immunity and remedies under the Administrative Procedure Act. To the extent that it conflicts with established Eleventh Amendment precedent, it is inapplicable.
 
 See Native Village of Noatak v. Blatchford,
 
 38 F.3d 1505, 1513 (9th Cir.1994).
 

 2
 

 Petitioner next argues that the relief being sought would “have no true impact on the state treasury” because the Forfeiture Fund was “entrusted” to the Task Force to hold for distribution in accordance with state forfeiture law.
 

 Petitioner cites
 
 Schiff v. Williams,
 
 519 F.2d 257 (5th Cir.1975), in which the Fifth Circuit upheld an award of back pay to student newspaper editors illegally fired by state 'officials. The award in
 
 Schijf was
 
 to be paid from a fund specifically set aside for that purpose and maintained separately from other state funds. “The effect of paying over such trust funds for their intended purpose would be an ancillary one at best,” the court held.
 
 Id.
 
 at 262 (Clark, J., concurring).
 

 To the extent that
 
 Schijf
 
 allows repayment of monies held in trust by state officials as distinct from other damages, it is contrary to broader Eleventh Amendment doctrine. In
 
 McAuliffe v. Carlson,
 
 520 F.2d 1305 (2d Cir.1975), for instance, officials of a state mental hospital misappropriated funds belonging to the plaintiff and held by the hospital as the plaintiffs conservator. The Second Circuit reversed an award of restitution, holding that
 

 [e]ven ... where the claim is that the state has illegally taken or used plaintiffs property, not merely wrongfully withheld it, the Eleventh Amendment applies with full force; and neither the means of obtaining such funds nor the formalities of the manner in which they are held limits the scope of the Eleventh Amendment rejection of federal judicial power.
 

 520 F.2d at 1308;
 
 cf. Papasan
 
 478 U.S. at 281, 106 S.Ct. at 2942 (where state held land in trust but sold land and lost the proceeds, such conduct could not be considered “breach of a continuing obligation to comply with the trust obligations”);
 
 Edelman,
 
 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (order for remission of welfare benefits barred, even though funds at issue were provided in part by the federal government for distribution to welfare recipients);
 
 Yorktown,
 
 948 F.2d at 87-88 (rejecting any distinction “between monetary damages and money in which plaintiff has a property interest”).
 

 A closer question may be raised where the monies to be awarded are kept in discrete accounts entirely isolated from general state treasuries.
 
 See Paschal v. Didrickson,
 
 502 U.S. 1081, 112 S.Ct. 992, 117 L.Ed.2d 152 (1992) (White, J., dissenting from denial of certiorari) (noting division among federal courts of appeal on question whether Eleventh Amendment bars retroactive recovery from segregated state unemployment insurance funds);
 
 cf. Fitzpatrick v. Bitzer,
 
 519 F.2d 559, 565 (2d Cir.1975),
 
 rev’d on other grounds, 427
 
 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (barring recovery from employee retirement fund after concluding that fund was
 
 not
 
 sufficiently separated from general appropriations);
 
 Mancuso v. New York State Thruway Auth.,
 
 86 F.3d 289, 296 (2d Cir.1996) (in determining whether state agency is arm of the state for Eleventh Amendment purposes, courts must consider whether judgment, if awarded, would be satisfied from state funds).
 

 But the Second Circuit has made clear that the crucial distinction for Eleventh Amendment purposes is between prospective and retroactive relief, not between awards impacting the state treasury and
 
 *251
 
 those drawn from non-treasury sources.
 
 New York City Health and Hospitals Corp.,
 
 50 F.3d at 135;
 
 see McAuliffe,
 
 520 F.2d at 1308 (“the formalities of the manner in which [state funds] are held” are immaterial);
 
 cf. Papasan,
 
 478 U.S. at 281, 106 S.Ct. at 2942 (barring award for “accrued monetary liability”);
 
 Green
 
 v.
 
 Mansour,
 
 474 U.S. at 68, 106 S.Ct. at 426 (“Remedies designed to end a continuing violation of federal law” are permitted, while “compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.”).
 

 Treasure Salvors
 
 is not to the contrary. In that case, the district court issued a warrant for the arrest of artifacts held illegally by state officials. In theory, such relief was “retroactive” in the same manner as the repayment of withheld benefits struck down in
 
 Edelman
 
 and other cases.
 

 The Supreme Court nonetheless upheld the warrant as a valid exercise of the lower court’s admiralty
 
 in rem
 
 jurisdiction. The Court took pains to note that such relief “did not seek any attachment of state funds and would impose no burden on the state treasury.” 458 U.S. at 698, 102 S.Ct. at 3321 (plurality opinion);
 
 cf. Sea Services of the Keys v. State of Florida,
 
 156 F.3d 1151, 1153 (11th Cir.1998).
 

 In any event, this is not a case in which the award would have no impact on the state treasury. All but a fraction of the original Forfeiture Fund has been spent or subsumed into the operating budgets of the Task Force and other agencies. It is unclear precisely how the Task Force disposed of the missing monies, which come to approximately $1.4 million. Respondents’ representations to the Court on this issue have been evasive at best. While the fate of this sum is irrelevant for present purposes, it may be pertinent in an action against Yacco and Quinlan in their individual capacities.
 

 As to what little remains of the original corpus, state law requires that any forfeiture proceeds left over after the mandatory distributions under § 1349 are retained by the state to be used for law enforcement and prosecution purposes.
 
 See
 
 N.Y.G.P.L.R. § 1349(2)(g)-(h).
 

 Any judgment levied against the corpus of the Fund would thus draw down the amount subsequently available for such purposes. As such, it would have an impermissible “financial impact on the state[ ].”
 
 Edelman,
 
 415 U.S. at 666 n. 11, 94 S.Ct. at 1357 n. 11 (where state has “definable allocation to be used in the payment of public aid benefits,” an award of retroactive damages paid from that sum “will invariably mean there is less money available for payments for the continuing obligations of the public aid system”).
 

 Of course, the same could be said of virtually any award involving the expenditure of money held by the state, whether or not that money has been commingled with general state funds. The difficulty in drawing this line has led several circuits, apparently including this one, to reject any distinction based on the location of disputed monies.
 
 McAuliffe,
 
 520 F.2d at 1308;
 
 Paschal v. Jackson,
 
 936 F.2d 940 (7th Cir.1991) (Eleventh Amendment bars retroactive monetary relief even from segregated fund);
 
 Esparza v. Valdez,
 
 862 F.2d 788 (10th Cir.1988) (same).
 

 In short, this Court is powerless to order respondents to pay damages for their past wrongdoing, at least to the extent they are sued in their official capacities. This is so even where the monies at issue would go to a statutorily designated beneficiary and even where state officials have allegedly appropriated such monies for their own benefit without any plausible legal authority.
 

 This is admittedly a curious result, perhaps even indefensible as a matter of common sense and equity as between the parties. But equity and common sense clearly are not the guiding lights of contemporary Eleventh Amendment doctrine.
 

 D
 

 In addition to seeking return of its share of the Forfeiture Fund, petitioner has
 
 *252
 
 asked for declaratory relief. If all other relief is barred by the Eleventh Amendment, declaratory judgment that state officials have violated federal law would serve no purpose.
 
 Marbley v. Bane, 57
 
 F.3d 224 (2d Cir.1995).
 

 It is possible, of course, that such a judgment will be useful if petitioners pursue their claims in state court, as the Court encourages them to do. But that is not a sufficient reason for the Court to grant declaratory relief in this action.
 
 See Green v. Mansour,
 
 474 U.S. 64, 72-73, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985).
 

 IV
 

 Nothing in this memorandum and order should be construed as preventing or discouraging petitioner from pursuing this action against Vacco and Quinlan individually, rather than in their official capacities. The Eleventh Amendment poses no barrier to such an action, even if the result would be an award of retroactive money damages.
 
 See Hafer v. Melo,
 
 502 U.S. 21, 29-30, 112 S.Ct. 358, 364-65, 116 L.Ed.2d 301 (1991).
 

 The record at present does not provide a sufficient basis for the Court to consider the such a claim. Individual capacity suits pose fundamentally different issues than those addressed in the current submissions, including the extent of respondents’ personal culpability and the availability of defenses such as absolute or qualified immunity. The Court does not reach the merits of such an action at this time.
 

 VI
 

 Respondents motion to dismiss is granted to the extent that the petition names respondents in their official capacities, but denied to the extent they are named in their individual capacities. Petitioner’s cross-motion for summary judgment is denied.
 

 So ordered.